#24566-a-SLZ

**2008 SD 81**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                                    Plaintiff and Appellee,

  v.

JOSEPH J. ROUBIDEAUX,                                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JANINE KERN
Judge

* * * *

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General
Pierre, South Dakota                                    Attorneys for plaintiff
                                                        and appellee.


BRYAN T. ANDERSEN
Pennington County Public
 Defender's Office
Rapid City, South Dakota                                Attorneys for defendant
                                                        and appellant.

* * * *

CONSIDERED ON BRIEFS
ON MAY 19, 2008

OPINION FILED **08/06/08**

#24566

ZINTER, Justice

[¶1.] Joseph J. Roubideaux appeals the denial of a motion for judgment of acquittal, challenging sufficiency of the evidence supporting his first degree felony murder conviction. We affirm.

I

[¶2.] We review the evidence supporting the jury verdict. State v. Rhines, 1996 SD 55, ¶157, 548 NW2d 415, 451. In January of 2006, Roubideaux escaped from the South Dakota State Penitentiary. He later fled to White River, South Dakota to live with a relative. Prior to fleeing, Roubideaux cut his hair and shaved his beard and mustache. According to Roubideaux, it was a "pretty drastic move," but he "needed a disguise, some kind of disguise where they wouldn't recognize me." During that time his picture often appeared on the local news. When questioned by his relatives, Roubideaux testified that he "lied and told them that it wasn't me."

[¶3.] In February of 2006, Roubideaux hitchhiked to Rapid City. After staying at a cousin's house for a few days, he met the victim, Boyd White Bull, while Roubideaux was "walking around" Rapid City. According to Roubideaux, he told White Bull that Roubideaux was from out-of-town, and White Bull told Roubideaux that he could stay at White Bull's apartment. The record reflects that it was not uncommon for White Bull to befriend strangers. Family and friends described White Bull as "kind-hearted," a "real gentle guy," who was always "just trying to help people." According to White Bull's sister, "he talked to anybody, you know, whether he knew them or not." And, according to White Bull's brother-in-law,

White Bull "would meet somebody and take them home and feed them[.]"  Because of his nature, his family was concerned that White Bull was very vulnerable.

[¶4.]     A few days before his death, White Bull told his friend, Lester Sierra, that he had someone staying with him.  According to Sierra, White Bull was "a little leery about [the person staying at his apartment].  He was giving [White Bull] problems."  White Bull's niece, Lori Standing Bear, testified that the last time she saw White Bull (Thursday, March 2, 2006), Standing Bear and her brother Don went to White Bull's apartment.  She testified that White Bull typically invited her into his apartment, but on that day "he was acting strange.  That wasn't Boyd.  Boyd always invited you in, but that day, he stood outside and waited for us."  According to Lori, that made her think that something was wrong.  Don also testified that White Bull "seemed nervous," and that "he was odd . . . it just wasn't, you know, like him[.]"

[¶5.]     By Saturday, March 4, Rose Standing Bear, White Bull's sister, was concerned about her brother's well-being.  She and her husband arranged to meet the manager of White Bull's apartment to check on him.  After entering the apartment, they found White Bull's body on the floor in a black, crusted pool of blood.  He had obviously been dead for a period of time.  Standing Bear also observed bloody shoeprints on the floor.  White Bull's wallet was open next to his body.  White Bull's identification card had been removed from the wallet and was "blood soaked and all brown."

[¶6.]     Paramedic Dan Janacek confirmed the large amount of blood on the floor.  Janacek indicated that White Bull "looked to be deceased before we even

actually made physical contact." Janacek also confirmed that White Bull's wallet was open and that his identification card was outside of the wallet lying next to the wallet. He testified that it "kind of threw a red flag up to me that that possibly could have been a crime."

[¶7.] An autopsy revealed that White Bull died of multiple stab wounds. Pathologist Dr. Donald Habbe testified that a stab wound to White Bull's chest was in and of itself a potentially lethal wound. A stab wound to White Bull's neck transected the right carotid artery and was also in and of itself fatal. Habbe testified that the neck wound suggested that "either [White Bull] [tried] to get away or the knife [was] moving as the wound [wa]s being inflicted." Habbe testified that yet another wound to White Bull's back was potentially lethal. Habbe finally opined that White Bull likely died Thursday evening, March 2, or Friday, March 3.

[¶8.] Law enforcement testified that it was obvious White Bull struggled with an assailant because of the streaking and smearing of blood around the body. Rapid City Police Officer Mike Jordahl testified that based on his investigation, the motive appeared to be a robbery. He testified: "knowing that the wallet and the ID were not pulled out by any one of us or anybody prior to us, meaning law enforcement or medical personnel, it was apparent that somebody took the wallet out, took money out of it probably."

[¶9.] The investigation tied Roubideaux to the homicide. Roubideaux's cousin disclosed that she had given Roubideaux a ride to White Bull's apartment.[1]

---

1.       Shortly after White Bull's murder, Roubideaux's cousin, Alexis Roubideaux, told the police that she and a friend had received a phone call from a distant

(continued . . .)

Officer Jordahl testified that he was able to retrieve a right thumbprint from White Bull's identification card,[2] which was next to the body and wallet. That thumbprint matched Roubideaux's. Officer Jordahl, a fingerprint expert, testified that there was no doubt that "the latent print on [White Bull's] ID card deposited in [White Bull's] blood with the right thumb of Joseph Roubideaux was made by Joseph Roubideaux." Officer Jordahl further testified that "in this case there is an overwhelming amount of detail in agreement with no discrepancies, meaning that overwhelmingly, that is an identification [i.e., that the fingerprint on White Bull's identification card was Roubideaux's]." When asked how sure he was that the fingerprint on the identification card was Roubideaux's, Officer Jordahl replied, "100 percent positive."

[¶10.] On March 3, 2006, Roubideaux was stopped by Wyoming authorities, and he used the alias Donald Witt. The officer observed blood on one of Roubideaux's pant legs. Roubideaux told the officer that "he had cut his leg crawling over a barbed-wire fence." On March 19, 2006, Roubideaux was arrested

---

(. . . continued)

relative named either Joe Stranger Horse or Daniel Stranger Horse, which authorities subsequently determined was an alias Roubideaux used. Alexis told authorities that Roubideaux arrived at a relative's house and Alexis gave him a ride to White Bull's apartment.

2. The thumbprint was not visible until Officer Jordahl treated the card with amido black. Stacey Smith, a criminalist at the South Dakota State Forensic Laboratory, testified that amido black is "a procedure that's commonly used [on] latent print[s] . . . to look for ridge detail." She also testified that it is common for fingerprint examiners at the laboratory to use amido black to enhance a print.

in Billings, Montana on an unrelated matter. In this instance, Roubideaux attempted to flee, and again used the alias Donald Witt.

[¶11.] Roubideaux was not apprehended until after he was released from the Montana jail and had hitchhiked to Washington. When arrested in Seattle, Roubideaux again used the alias Donald Witt. In a subsequent interview, Roubideaux initially denied ever having been in South Dakota or knowing White Bull, but later admitted both facts. He also admitted staying with White Bull, yet asserted that White Bull was alive when Roubideaux left. When the authorities told Roubideaux that all of the evidence "point[s] to you[,] not to anybody else," he responded: "So it wasn't the perfect crime." While being transported back to Rapid City, Roubideaux asked a detective if South Dakota still had the death penalty.

[¶12.] At the close of the State's case, Roubideaux moved for a judgment of acquittal under SDCL 23A-23-1.[3] The circuit court denied the motion, finding there was sufficient evidence for the case to be submitted to the jury. Roubideaux appeals the denial of his motion for judgment of acquittal.

---

3.     This statute provides:

> Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. A court on motion of a defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in an indictment or information after the evidence on either side is closed, if the evidence is insufficient to sustain a conviction of the offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the prosecuting attorney is not granted, the defendant may offer evidence without having reserved the right.

SDCL 23A-23-1.

II

[¶13.]    In reviewing the denial of a motion for judgment of acquittal, we determine "whether the 'evidence was sufficient to sustain the conviction[.]'" State v. Nuzum, 2006 SD 89, ¶9, 723 NW2d 555, 557 (citation omitted). "[T]he issue . . . is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt." State v. Bordeaux, 2006 SD 12, ¶6, 710 NW2d 169, 172. The evidence is considered "in the light most favorable to the verdict." *Rhines*, 1996 SD 55, ¶157, 548 NW2d at 451.

[¶14.]    Roubideaux argues that the evidence was insufficient to establish the elements of murder. To convict of first degree felony murder, the State had to prove the following elements: (1) that Roubideaux was engaged in the perpetration of or attempt to perpetrate a robbery of White Bull; and (2) that Roubideaux caused the death of White Bull to prevent detection or prosecution of the crime. *See* SDCL 22-16-4(2).[4]

_____

4.    SDCL 22-16-4(2) provides:

> Homicide is [ ] murder in the first degree if committed by a person who perpetrated, or who attempted to perpetrate, any arson, rape, robbery, burglary, kidnapping or unlawful throwing, placing or discharging of a destructive device or explosive and who subsequently effects the death of any victim of such crime to prevent detection or prosecution of the crime.

The essential elements of the crime of robbery are: (1) that Roubideaux intentionally took personal property in the possession of White Bull from White Bull's personal or immediate presence; (2) such personal property was so taken against the will of White Bull who was in possession thereof, that is, with the knowledge of White Bull and against his will; and (3) Roubideaux accomplished such taking by use of force or fear. *See* SDCL 22-30-1; SDCL 22-30-6.

[¶15.] Roubideaux contends there was no evidence that he: (1) stabbed White Bull; (2) acted with a premeditated design to affect White Bull's death; and (3) possessed any property of White Bull. We need not address Roubideaux's second contention regarding premeditation because Roubideaux was convicted of felony murder rather than first degree premeditated murder. Compare first degree felony murder under SDCL 22-16-4(2) (only requiring the effectuation of a death in an attempted robbery) with first degree premeditated murder under SDCL 22-16-4(1) (requiring "a premeditated design to effect the death of the person killed").

[¶16.] So also, we need not address Roubideaux's third contention that Roubideaux must have possessed property of White Bull. We need not address this contention because felony murder does not require the completion of a robbery: felony murder may involve the mere attempt to commit robbery. *See* SDCL 22-16-4(2) (providing, felony murder occurs when the homicide is committed in an "attempt to perpetrate [a] . . . robbery"); SDCL 22-4-1; SDCL 22-30-1 (providing that attempted robbery occurs when a person attempts to commit a robbery and, in the attempt, fails in the perpetration).

[¶17.] With respect to his first contention, Roubideaux asserts that there was insufficient evidence that he stabbed White Bull. Roubideaux focuses on the evidence of identity, contending that there was "[o]nly a lone thumbprint on White Bull's ID card laying [sic] next to his body that may or may not have been in White Bull's blood." Roubideaux contends that a conviction based on such circumstantial evidence is insufficient.

[¶18.] Notwithstanding Roubideaux's contention, it is not necessary that the State prove its case by direct evidence. "Direct and circumstantial evidence have equal weight." State v. Webster, 2001 SD 141, ¶13, 637 NW2d 392, 396. In some instances, "circumstantial evidence can be more reliable than direct evidence." State v. LaPlante, 2002 SD 95, ¶32, 650 NW2d 305, 313. This is such a case. Roubideaux's fingerprint on the identification card in the victim's own blood was powerfully incriminating. As other courts have recognized, fingerprint evidence is often the "strongest evidence of identity." State v. Riley, 182 Neb 300, 303, 154 NW2d 741, 743 (1967).

[¶19.] Roubideaux, however, argues: (1) that the fingerprint "may or may not have been in White Bull's blood"; and (2) that "because amido black had been applied by [ ] Jordahl prior to its submission to the laboratory, [the] criminalist was unable to do a phenylthalene test on the substance to confirm that it was blood." Roubideaux's arguments fail to acknowledge that the type of bodily fluid was essentially irrelevant in light of the fact there is no dispute that the bodily fluid belonged to White Bull. Ultimately, whether the substance was blood or other bodily fluid, Roubideaux's thumbprint on White Bull's identification card was made in the bodily fluid surrounding White Bull's body, and that fluid matched White Bull's DNA. Moreover, the evidence established that Roubideaux's fingerprint was a very "clean" latent print, suggesting that it was not on White Bull's identification card for any significant period of time. Therefore, the fingerprint evidence was sufficient for the jury to have found that Roubideaux impressed his fingerprint on White Bull's identification card in the course of an attempted robbery and stabbing.

[¶20.] Furthermore, this was not the only circumstantial evidence tying Roubideaux to White Bull's death. As previously noted, the evidence indicated that White Bull had a habit of allowing strangers to stay overnight, Roubideaux admitted staying with White Bull during the relevant period of time, White Bull was having trouble with Roubideaux, Roubideaux had recently escaped from the penitentiary, and since that time Roubideaux had been moving about attempting to conceal his identity. The State also presented evidence of Roubideaux's post-homicide flight, further concealment of his identity, and upon apprehension, his admission that "it wasn't a perfect crime," along with his inquiry whether South Dakota had the death penalty.

[¶21.] Considering all of the evidence in the light most favorable to the verdict, there was sufficient evidence to find that Roubideaux fatally stabbed White Bull in the course of an attempted robbery. The circuit court's denial of Roubideaux's motion for acquittal is affirmed.

[¶22.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.