#26653-a-GAS

**2014 S.D. 49**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,            Plaintiff and Appellee,

    v.

CHRIS ALLEN MILLER a/k/a
CHRIS ALLEN HUBER,            Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
BON HOMME COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE GLEN W. ENG
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

KELLY MARNETTE
Assistant Attorney General
Pierre, South Dakota            Attorneys for plaintiff
                                       and appellee.

SCOTT J. PODHRADSKY
Wipf & Cotton Law Offices
Wagner, South Dakota            Attorneys for defendant
                                       and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON APRIL 28, 2014

OPINION FILED **07/16/14**

#26653

SEVERSON, Justice

[¶1.] A jury convicted Chris Miller of second degree murder and aggravated assault for the death of his son—Jacob. Miller appeals. We affirm.

## Background

[¶2.] Jacob was born on October 27, 2010, to his mother—Stacy Miller (Stacy), and father—Chris Miller (Miller). Jacob had an older sister who was born on August 13, 2009. The family lived in Scotland, South Dakota.

[¶3.] On March 3, 2011, Stacy was at home while Miller worked at a construction job in Yankton, South Dakota. After work, Miller brought home a bottle of Lord Calvert whiskey. Miller admitted he drank approximately one-and-one-half drinks. Stacy became intoxicated, to the point where she remembers very little about what occurred later that night. Jacob fell asleep between 6:00 p.m. and 7:00 p.m.

[¶4.] At 11:43, Miller called 911. He reported that his wife had been sleeping on Jacob and he was not breathing. The operator dispatched emergency medical technicians (EMTs) who transported Jacob to the Scotland hospital. Initially at the hospital, Jacob's heart was not beating and he was not breathing. Medical staff determined that Jacob needed specialized care in Sioux Falls.

[¶5.] Jacob was flown to a Sioux Falls hospital. Stacy went by car with her parents; Miller went separately. The treating physician—Dr. Mina Hafzalah— found a skull fracture and intracranial bleeding, fractured ribs, increased intracranial pressure, and retinal hemorrhages. Later, the medical staff advised the family that Jacob would never recover and if he lived, he would be severely

-1-

neurologically devastated. The family decided to withdraw further care—Jacob died three hours later on March 8, 2011.

[¶6.] On March 9, 2011, the State charged Miller with first degree murder, second degree murder, and first degree manslaughter. On March 16, 2011, a Bon Homme County Grand Jury indicted Miller for second degree murder, first degree manslaughter, and aggravated assault. The State filed a Part II Information for habitual offender on March 22, 2011. A jury trial began on January 17, 2013.

[¶7.] At trial, the State's theory was that Miller had become frustrated with Jacob and physically assaulted him, causing his death. The State presented testimony about Jacob's injuries from treating physicians and outside experts. The State also presented testimony from Miller's prison cell-mate—Billy Chaffin—about a possible admission. Miller's trial theory was that Stacy dropped Jacob, got back in bed, and suffocated him as she lay passed out; that subsequent oxygen given to Jacob caused his brain to swell and resulted in his heart stopping. The defense presented expert testimony about the injuries that result from a baby's fall. Miller moved for a judgment of acquittal, which the circuit court denied.

[¶8.] On January 30, 2013, the jury found Miller guilty of second degree murder and aggravated assault. On February 15, 2013, Miller admitted to the Part II Information. The circuit court sentenced Miller to life imprisonment for the second degree murder and fifty years imprisonment for the aggravated assault to be served consecutively in the South Dakota State Penitentiary.

[¶9.] Miller appeals, arguing the circuit court erred by (1) denying his motion for judgment of acquittal; (2) coercing a jury verdict; and (3) allowing

Chaffin's testimony. We address Miller's first and third argument. Miller waived the second argument by failing to object.[1]

## Standard of Review

[¶10.] "In reviewing the denial of a motion for judgment of acquittal, we determine 'whether the evidence was sufficient to sustain the conviction.'" *State v. Dowty*, 2013 S.D. 72, ¶ 15, 838 N.W.2d 820, 825 (quoting *State v. Roubideaux*, 2008 S.D. 81, ¶ 13, 755 N.W.2d 114, 118). This Court accepts "the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict." *State v. Shaw*, 2005 S.D. 105, ¶ 19, 705 N.W.2d 620, 626. "If the evidence including circumstantial evidence and reasonable inferences drawn therefrom sustain a reasonable theory of guilt, a guilty verdict will not be set aside." *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342.

[¶11.] The circuit court's decision to admit or deny witness testimony is reviewed under an abuse of discretion standard. *State v. Fisher*, 2011 S.D. 74, ¶ 32, 805 N.W.2d 571, 578 (citations omitted). An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision,

---

1. Miller argues that the circuit court coerced a jury by giving the jury a choice to continue deliberating after 8:00 p.m. The State argues that Miller waived this argument by failing to object at trial and in the alternative, that there was no evidence of coercion. The record shows no objection from Miller as to the manner the judge handled jury deliberations. As such, the issue is waived. *State v. Roach*, 2012 S.D. 91, ¶ 27, 825 N.W.2d 258, 266 ("[F]ailure to object at trial constitutes a waiver of that issue on appeal.") (citation omitted). Further, this Court sees no plain error here. *See State v. Beck*, 2010 S.D. 52, ¶¶ 10-11, 785 N.W.2d 288, 292-93.

which, on full consideration, is arbitrary or unreasonable." *Thurman v. CUNA Mut. Ins. Soc'y*, 2013 S.D. 63, ¶ 11, 836 N.W.2d 611, 616 (citations omitted).

### Analysis

[¶12.]       **Miller's motion for judgment of acquittal.**

[¶13.]       Miller argues that the evidence at trial was insufficient to sustain a verdict beyond a reasonable doubt—that the State could not set forth the mechanism of injury or which parent provided the mechanism of injury. The State argues that the trial evidence supports the jury's verdict.

[¶14.]       The elements of second degree murder are set forth in SDCL 22-16-7: "Homicide is murder in the second degree if perpetrated by any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person, including an unborn child." The elements of aggravated assault are set forth in SDCL 22-18-1.1 (2011): "Any person who: . . . (7) Intentionally or recklessly causes serious bodily injury to an infant, less than three years old, by causing any intracranial or intraocular bleeding, or swelling of or damage to the brain, whether caused by blows, shaking, or causing the infant's head to impact with an object or surface; is guilty of aggravated assault. . . ."[2]

[¶15.]       To support its trial theory, the State provided testimony from Stacy, first responders, treating physicians, and other experts. Stacy testified that Miller would get frustrated with Jacob. She stated that around a month before March 3,

2011, Miller, appearing frustrated, held Jacob over his head with his hands around his ribcage and shook him. Stacy claimed Jacob was fussier with Miller after that.

[¶16.] EMTs Tammy Rueb and Jim Maruska testified about their first response. They stated that upon arrival, Miller was holding and performing CPR on Jacob. When asked what happened, Rueb testified that Miller replied "she was laying on him." Rueb also testified that she heard Stacy screaming and hollering— "I'm sorry, I'm so sorry, I didn't mean to do it." The EMTs then took Jacob to the hospital. Later, they returned to the house to bring Stacy to the hospital. Rueb testified the bedroom was in perfect condition: "Like no one had even sat on the bed."

[¶17.] Officer Mike Hofeldt testified that he arrived at the Miller residence at the same time as the EMTs. When he asked Miller what happened, Officer Hofeldt testified that Miller said Stacy had taken Jacob to bed with her, and then when he went to bed, he discovered Stacy lying on Jacob. Officer Hofeldt testified that Miller walked out of the house and down the street, not responding to his calls to return. Later that night, Bon Homme County Sheriff Jason Bechtold retrieved Miller from a friend's house. Sheriff Bechtold testified that he found Miller lying on a bed, crying. Sheriff Bechtold took Miller to the hospital. Miller was angry. Miller then left the hospital. Officer Hofeldt found Miller at his residence.

[¶18.] Sheriff Bechtold and DCI Agent Todd Rodig joined Officer Hofeldt at

---

2. The Legislature later deleted subdivision (7), among other changes. 2012 S.D. Sess. Laws ch. 123, § 4.

Miller's residence. Agent Rodig recorded the meeting. In the recording, when asked what happened, Miller said Jacob was lying in the vibrating chair and Stacy was in bed. Jacob started crying so he woke Stacy up. Stacy got Jacob and took him to bed with her. Thirty to forty-five minutes later, he went in and found Stacy lying on top of Jacob. Sheriff Bechtold testified that Miller then demonstrated how Stacy was lying. Sheriff Bechtold said that the bed "looked like nobody had laid in it at all."

[¶19.] The State also provided medical evidence. Dr. Hafzalah treated Jacob when he arrived at the pediatric intensive care unit in Sioux Falls. Dr. Hafzalah testified about the "history" conversation she had with Miller. According to Dr. Hafzalah, Miller said he had Jacob while surfing the internet, he then took Jacob to Stacy who was sleeping, laid Jacob next to her, then went back to surfing the internet. About a half-hour later, he walked in and noticed Stacy had rolled over onto Jacob. He found Jacob not breathing, so he started CPR.

[¶20.] Dr. Hafzalah testified as to Jacob's condition: "four-month old with significant global ischemic injury of the frontal lobes, parietal lobes, temporale [sic] lobes and occipital lobes as well as acute subdural hematomas, acute intraventricular hemorrhage and areas of subarachnoid hemorrhage." Dr. Hafzalah opined that the hemorrhages were caused by trauma and that the skull fracture occurred because of an impact. Dr. Hafzalah further opined that the injuries were non-accidental in nature. Dr. Nicholas Rivera, a pediatric intensivist who also cared for Jacob, opined that either repeated shaking or severe blows to Jacob's head caused Jacob's retinal hemorrhages. Dr. Rivera further opined that Jacob's injuries were from non-accidental trauma. Dr. Edward Mailloux, a pediatrician with

#26653

expertise in evaluating children for abuse and neglect, examined Jacob on March 4, 2011. Dr. Mailloux diagnosed Jacob with abusive head trauma and opined that a two to four foot fall onto a hardwood floor could result in a skull fracture, but not the type exhibited by Jacob.

[¶21.]	Other experts testified for the State. Dr. Susan Duffek, a pediatric radiologist, noted fractures in Jacob's seventh and eighth left ribs, testifying that she had primarily seen that type of injury in child abuse cases where a significant amount of force is used to squeeze violently a child. Also, Dr. Duffek diagnosed Jacob's skull fracture as mildly diastatic, indicative that more force was used than with a simple fracture. That injury along with the magnitude of subdural hemorrhaging found with Jacob, Dr. Duffek testified, is highly suggestive of non-accidental trauma. Dr. Dustin Dierks, an ophthalmologist, observed Jacob's eyes and noted extensive retinal hemorrhages. He testified that a common cause of retinal hemorrhages is head trauma, though conceded that CPR, among other things, can cause retinal hemorrhaging. Dr. Geoffrey Tufty, a pediatric ophthalmologist, opined that Jacob's extensive retinal hemorrhages were the result of an acceleration-deceleration episode, not accidental trauma. But like Dr. Dierks, Dr. Tufty conceded other events can cause retinal hemorrhaging. Dr. Germano Falcao, a pediatric neurologist, opined that one mechanism to cause Jacob's injuries could be a sudden acceleration-deceleration, which includes a blow to the head. He opined that it was unlikely that a fall from two to four feet caused Jacob's injuries.

[¶22.]	Dr. Kenneth Snell conducted Jacob's autopsy on March 9, 2011. Dr. Snell noted and testified to the following external injuries: (1) an aging semi-

#26653

expertise in evaluating children for abuse and neglect, examined Jacob on March 4, 2011. Dr. Mailloux diagnosed Jacob with abusive head trauma and opined that a two to four foot fall onto a hardwood floor could result in a skull fracture, but not the type exhibited by Jacob.

[¶21.]	Other experts testified for the State. Dr. Susan Duffek, a pediatric radiologist, noted fractures in Jacob's seventh and eighth left ribs, testifying that she had primarily seen that type of injury in child abuse cases where a significant amount of force is used to squeeze violently a child. Also, Dr. Duffek diagnosed Jacob's skull fracture as mildly diastatic, indicative that more force was used than with a simple fracture. That injury along with the magnitude of subdural hemorrhaging found with Jacob, Dr. Duffek testified, is highly suggestive of non-accidental trauma. Dr. Dustin Dierks, an ophthalmologist, observed Jacob's eyes and noted extensive retinal hemorrhages. He testified that a common cause of retinal hemorrhages is head trauma, though conceded that CPR, among other things, can cause retinal hemorrhaging. Dr. Geoffrey Tufty, a pediatric ophthalmologist, opined that Jacob's extensive retinal hemorrhages were the result of an acceleration-deceleration episode, not accidental trauma. But like Dr. Dierks, Dr. Tufty conceded other events can cause retinal hemorrhaging. Dr. Germano Falcao, a pediatric neurologist, opined that one mechanism to cause Jacob's injuries could be a sudden acceleration-deceleration, which includes a blow to the head. He opined that it was unlikely that a fall from two to four feet caused Jacob's injuries.

[¶22.]	Dr. Kenneth Snell conducted Jacob's autopsy on March 9, 2011. Dr. Snell noted and testified to the following external injuries: (1) an aging semi-

#26653

circular contusion on Jacob's right side abdomen; (2) an aging small contusion on Jacob's right thigh; (3) a recent small contusion on Jacob's right calf; (4) four recent small contusions on Jacob's left calf consistent with a fingertip grabbing pattern; and (5) three distinct contusions on Jacob's head. Dr. Snell opined that the external injuries were due to a blunt object striking Jacob or Jacob striking a blunt object. Dr. Snell noted the following internal injuries: (1) healing fractures in the seventh, eighth, and ninth left ribs; (2) a pocket of blood under the bruised area of Jacob's scalp; (3) a two-and-three-fourth inches long skull fracture under the pocket of blood; (4) swelling of the brain; (5) acute and chronic subdural bleeding; (6) subarachnoid bleeding; (7) a bruise on the occipital lobe of the brain on the opposite side as the skull fracture; (8) increased cranial pressure; (9) extensive retinal hemorrhaging all the way to the ora serrata; and (10) hypoxic ischemic encephalopathy. Dr. Snell found Jacob's rib injuries and chronic subdural bleeding were about two months old. Ultimately, Dr. Snell determined the cause of Jacob's death to be abusive trauma inflicted by another person.

[¶23.] The State, over Miller's objection, also offered the testimony of Billy Chaffin, who conversed with Miller in the Bon Homme county jail around July 8 to 13, 2011. Chaffin claims Miller told him that "they had been fighting, he was mad, he wouldn't shut up, so he hit him." Chaffin initially thought Miller was talking about a bar fight but when he later heard about Miller's charges, he approached authorities with the information.

[¶24.] Further, the State raised several inconsistencies with Miller's story. One inconsistency was how Jacob ended up in the bedroom—whether Stacy brought

-8-

or Miller took him there. Another inconsistency, the State argued, was what exactly happened in the bedroom—whether Miller heard a thump from a fall or not. Another inconsistency raised by the State was Jacob's computer use that night, how according to Agent Rodig who examined Miller's computer, it would have been impossible for Miller to be looking at information on the computer screen, as he claimed, during the time Miller claims Stacy was in bed.

[¶25.] Miller's cross-examination of the State's expert witnesses focused on whether a short fall can cause the type of injury Jacob presented. Several experts conceded there is current debate amongst the field on that topic. Miller's expert witness, Dr. Robert Rothfeder, an emergency room physician, testified that it was possible that a short fall caused Jacob's skull fracture. Dr. Rothfeder also testified about the accidental bruising that results when patients receive emergency medical treatment. Dr. John Plunkett, a forensic pathologist, testified that a short fall with subsequent suffocation was very plausible and consistent with the autopsy findings. Dr. Kirk Thibault, a biomechanical engineer, opined that a short fall could cause a skull fracture such as the one exhibited by Jacob. Dr. Gautam Ray, the State's biomechanical engineer expert, agreed with Dr. Thibault that if a baby was dropped from shoulder height, there would be enough force to cause a skull fracture. Dr. Ray testified, though, that the three bruises on Jacob's head would not by caused by that type of fall. He further testified that Jacob's skull fracture could not be caused by Stacy rolling over on Jacob or caused by Stacy sliding off the bed and falling with Jacob on her lap.

[¶26.]    Miller testified. He stated that he was on the computer when Jacob started to fuss. He changed Jacob's diaper then took Jacob to the bedroom and woke Stacy up. According to Stacy and Miller, when Jacob fussed, only Stacy could calm him down. Miller testified that Stacy sat on the bed's edge and bounced Jacob on her knee. Miller then left Stacy. Miller said he later heard a thump coming from the bedroom. He tried to open the door, but testified that Stacy was lying in front of the door so he ran to the bathroom to enter through the second door. Miller said he saw Stacy lying on the floor, naked, holding Jacob, and apologizing. Miller helped Stacy and Jacob to the bed. Miller said Jacob appeared to have not awoken and didn't see any blood or bruising on Jacob. Miller then prepared for bed. When Miller returned, he testified that he saw Stacy sleeping face down and had to roll Stacy over to reveal Jacob. He said he then grabbed Jacob to begin mouth to mouth resuscitation. Miller then yelled at Stacy to call 911.

[¶27.]    Overall, there was conflicting testimony as to the night's unfortunate events. But it is the jury's function to resolve conflicts in the evidence, weigh credibility, and sort out the truth. *State v. Swan*, 2008 S.D. 58, ¶ 9, 753 N.W.2d 418, 420. There also may have been conflicting expert testimony. But "[w]hen opposing experts give contradictory opinions on the reliability or validity of a conclusion, the issue of reliability becomes a question for the jury." *State v. Guthrie*, 2001 S.D. 61, ¶ 38, 627 N.W.2d 401, 417.

[¶28.]    "Notably, an appellate court is not required to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt' when reviewing the sufficiency of the evidence." *Dowty*, 2013 S.D. 72, ¶ 15, 838

N.W.2d at 825 (quoting *State v. Plenty Horse*, 2007 S.D. 114, ¶ 5, 741 N.W.2d 763, 765). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Plenty Horse*, 2007 S.D. 114, ¶ 5, 741 N.W.2d at 765).

[¶29.]      In this case, Stacy testified about Miller's frustration with Jacob and potential previous abuse. The first responders testified that Miller was at the scene and was later angry and belligerent. Numerous physicians testified that Jacob's injuries were from shaking, or blows, and were non-accidental in nature. Chaffin testified as to possible admissions from Miller. Accepting "the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict[,]" *Shaw*, 2005 S.D. 105, ¶ 19, 705 N.W.2d at 626, a rational trier of fact could have found that Miller became frustrated with and subsequently injured Jacob, whether by blows to the body or shaking, that eventually resulted in Jacob's death. Here, "the evidence including circumstantial evidence and reasonable inferences drawn therefrom sustain a reasonable theory of guilt[.]" *Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d at 342. Therefore, Miller's "guilty verdict will not be set aside." *Id.*

[¶30.]     **Chaffin's testimony.**

[¶31.]     Chaffin testified: "The note had said that – what I had remembered Chris saying was that they had been fighting, he was mad, he wouldn't shut up, so he hit him." Miller argues the circuit court abused its discretion by allowing Chaffin's testimony because Chaffin used an unavailable note to refresh his recollection and his testimony was highly prejudicial and lacked any indicia of reliability. The State argues the circuit court appropriately weighed the testimony's probative value before allowing it and that Miller's argument as to refreshing recollection is misplaced.

[¶32.]     Here, the circuit court conducted a hearing outside the jury's presence to determine the admissibility of Chaffin's proposed testimony. "The process of balancing the probative value of evidence against the possible prejudicial effect is in the sound discretion of the trial court." *State v. Guthmiller*, 2003 S.D. 83, ¶ 29, 667 N.W.2d 295, 305-06. And "[a] court's ruling on reliability receives the same deference as its decision on ultimate admissibility." *Guthrie*, 2001 S.D. 61, ¶ 30, 627 N.W.2d at 415. The circuit court heard from Agent Rodig, Chaffin, and counsel with their arguments. Although it did not make a specific finding as to Chaffin's reliability, the circuit court found Chaffin's testimony relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice. SDCL 19-12-3 (Rule 403). Ultimately, the circuit court allowed Chaffin's testimony, as its discretion allowed.

[¶33.] Additionally, the circuit court provided a jury instruction on admissions before Chaffin testified.[3] And, Miller had the opportunity to, and did, vigorously cross-examine Chaffin, raising questions as to Chaffin's credibility, motive, and memory. On review, the circuit court did not abuse its discretion by allowing Chaffin's testimony.

[¶34.] Miller also argues that Chaffin's testimony should be stricken pursuant to SDCL 19-14-22 (Rule 612 (b)) and SDCL 19-14-23 (Rule 612 (c)). SDCL 19-14-22 (Rule 612 (b)) states: "If, before testifying, a witness uses a writing or object to refresh his memory for the purpose of testifying and the court in its discretion determines that the interests of justice so require, an adverse party is entitled to have the writing or object produced, if practicable, at the trial, hearing,

---

3. The instruction:

> A statement made by a defendant other than at his trial may be
> an admission. An admission is a statement by a defendant
> admitting one or more of the facts at issue. It is not sufficient by
> itself to prove guilt of the crime charged, but it may proof [sic]
> one or more of the elements of the crime charged. You are the
> exclusive judges as to whether an admission was made by the
> defendant and if the statement is true in whole or in part. If you
> find that such statement is entirely untrue, you must reject it.
> If you find it is true in part, you may consider that part which
> you find to be true. It is for you to determine what weight, if
> any, to give to a purported admission; however, evidence of a
> claimed oral admission of the defendant ought to be viewed with
> caution and weighed with care. The guilt of the defendant may
> not be established only by an admission made outside of this
> trial. Before any person may be convicted of a criminal offense,
> there must be proof independent of the statement that the crime
> in question was committed, but it is not necessary the
> independent proof include proof as to the identity of the person
> by whom the offense was committed.

or deposition in which the witness is testifying." SDCL 19-14-23 (Rule 612 (c)) relates to a "party entitled to a have a writing or object produced under § 19-14-21 or 19-14-22 . . . ."

[¶35.]     Here, the writing was used to refresh Chaffin's memory before he met with Agent Rodig in August 2011.  It was not used to refresh Chaffin's memory at trial where he testified one-and-a-half years later.  Therefore, SDCL 19-14-22 (Rule 612 (b)) and SDCL 19-14-23 (Rule 612 (c)) do not apply to this particular writing under these particular circumstances.

## Conclusion

[¶36.]     Here, the evidence, which included Miller's alleged prior abuse of Jacob, frustration with Jacob, behavior after Jacob's injuries, inconsistent stories, admission to Chaffin, and medical and other expert testimony, supports the jury's guilty verdict.  Further the circuit court did not abuse its discretion by admitting Chaffin's testimony.  We affirm.

[¶37.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and WILBUR, Justices, concur.